# EXHIBIT 1

RECENT TRENDS IV:
WHAT EXPLAINS FILINGS AND SETTLEMENTS
IN SHAREHOLDER CLASS ACTIONS?

by

Denise N. Martin, Vinita M. Juneja,
Todd S. Foster, Frederick C. Dunbar

November 1996

# NATIONAL ECONOMIC RESEARCH ASSOCIATES

50 MAIN STREET, WHITE PLAINS, NEW YORK 10606
TELEPHONE: 914.448.4000  FACSIMILE: 914.448.4040

National Economic Research Associates, Inc. (NERA), a Marsh & McLennan Company, is an
international firm of consulting economists that provides research and analysis on a wide variety of
business and public policy issues. We support our findings with careful documentation and translate
complex material into clear language.

Established in 1961, NERA has earned wide recognition for its work in energy, public utility
regulation, antitrust, environment, securities litigation, transportation, health, international trade,
labor, telecommunications and sports. The firm consists of more than 275 full-time staff members
highly qualified in economics, finance, statistics, business administration, computer science and
mathematics. NERA has completed assignments for many of the world's largest corporations and law
firms, federal, state and municipal agencies, and governments.

n/e/r/a

Consulting Economists

# RECENT TRENDS IV:
# WHAT EXPLAINS FILINGS AND
# SETTLEMENTS IN SHAREHOLDER
# CLASS ACTIONS?

by[*]

**Denise N. Martin, Vinita M. Juneja,**
**Todd S. Foster, Frederick C. Dunbar**

We have updated and expanded our earlier studies on recent trends in securities class actions. Our data now cover the five full calendar years from January 1991 to December 1995, as well as dispositions reported through June 1996 and filings reported through October 1996. Below, we summarize our key findings.

- A decrease in the number of federal filings was observed in early 1996, but does not appear to signify a general downturn. The most recent data (which include filings reported through October 1996) indicate no significant decline in federal class action filings has occurred since passage of the Private Securities Litigation Reform Act of 1995 ("the Reform Act").

- A significant increase in the number of *state* filings has occurred since passage of the Reform Act.

- The filing rate of cases responds to overall stock market conditions. Significantly more cases are filed in the months following a bearish market

---

[*]   Denise N. Martin is a Senior Consultant, Vinita M. Juneja is a Vice President, Todd S. Foster is an Analyst and Frederick C. Dunbar is a Senior Vice President at National Economic Research Associates, Inc. (NERA), an economic research and consulting firm.

- ii -

than following a bullish one.  To date, these market movements have had a more pronounced impact on the filing rate than has the Reform Act.

- From January 1991 through June 1996, 998 shareholder class actions were dismissed, settled or resolved by a jury verdict.

- If the historic 12 percent average annual growth rate continues in 1996, we can expect almost 250 cases to be resolved this year, up from 138 in 1991.

- Over the full sample period, 80 percent of the cases were resolved through settlement.  Even cases that were dismissed, reached trial or received a jury verdict often settled before an appeal was resolved.

- Dismissals as a percentage of case dispositions have ranged between 14 and 21 percent over the past five and a half years.  In the first half of 1996, 20 percent of dispositions were dismissals, as they were in 1995, up from 16 percent in 1994.

- Approximately $3.9 billion has been paid out in settlement awards from January 1991 through June 1996 for 475 federal shareholder class action settlements.  These cases represent roughly 60 percent of all settlements, suggesting as much as $6.5 billion has been paid out overall.  On average, plaintiffs' attorneys have received one-third of the settlement awards in each year.

- Average settlements increased significantly between 1994 and 1995, as did plaintiffs' attorneys' fees.  In particular, the average settlement for calendar year 1995 was $10.6 million, up from $6.1 million in 1994.  Plaintiffs' attorneys' fees increased proportionately, from $2.0 million in 1994 to $3.5 million in 1995.  Average settlements and fees for the first six months of 1996,

- iii -

$7.0 million and $2.3 million, respectively, suggest the 1995 increase will not be sustained, and may even be reversed.

- The ratio of settlement value to plaintiffs' claimed damages over the sample period was 14 percent. The ratio of settlement value to investor losses was about 9 percent.

- About 25 percent of the settlements were for under $2 million.

- A disproportionately large number of securities class action cases are filed against high-technology firms, accounting for roughly 23 percent of all filings over the past five and a half years. This filing trend has continued in 1996. Curiously, only 15 percent of the cases that *settled* in the first half of this year were against high-technology companies, down from 30 percent over the past five years.

- As in our earlier studies, cases with higher plaintiffs' damage estimates and higher investor losses have higher settlements. However, the increase is less than proportional. As an example, consider two cases that are similar except that one has twice the plaintiffs' damage estimate of the other (e.g., $200 million versus $100 million). Our analysis shows that the expected settlement in the former case is roughly 48 percent higher than in the latter: about $12.3 million versus $8.3 million. This finding is consistent with the theory that settlement values are constrained by a firm's assets and insurance coverage, which are necessarily limited.

- Inclusion of accounting firms as codefendant adds over 70 percent to the expected settlement value of a shareholder class action for the period January 1991 to June 1996. This finding is again consistent with the notion that available assets, especially insurance, are a major factor in explaining

- iv -

settlement amounts. When we consider 1995 and 1996 settlements alone, this figure jumps to 150 percent. We posit that the increasing effect of these advisor defendants in 1995 may be related to a change after the *Central Bank* decision in how accountants' liability is pled. The proportionate liability clause enacted through the Reform Act may be partially responsible for the decline that we observe in the first half of 1996 in how much the inclusion of an accounting firm as codefendant adds to expected settlement value.

- Settlements that occur within one year of filing are about 25 percent below those that occur later. While this effect can be observed in settlements reached in the most recent 18 months, it has lost statistical significance. We posit that dynamics related to the Reform Act may be responsible.

- For cases settled between January 1995 and June 1996, a governmental agency investigation with an adverse outcome is associated with a statistically higher settlement, suggesting that the merits may be playing an increasing role in case resolution. Although the Reform Act did not govern the resolution of these cases, which were filed prior to its enactment, we suspect that it may be indirectly responsible.

- The presence or absence of accounting firms or underwriters as codefendants, the age of the case and the size of either investor losses or plaintiffs' damage estimate together explain between 52 and 64 percent of the variation in class action settlement values between 1991 and mid-1996.

- For a case in which a company and its officers and directors are named as defendants, an average of 70.0 percent of the settlement amount is paid from directors' and officers' liability insurance, 29.7 percent by the defendant company and 0.3 percent by the officers and directors personally.

- v -

- For a case with a concurrent derivative action, on average approximately 65 percent of the settlement is allocated to the shareholder class action.

# I.     BACKGROUND AND PURPOSE

Over the past five years, NERA has conducted a descriptive analysis of recent trends in securities class actions.  We publicize this research largely to provide a consolidated source of information for risk managers, counsel for plaintiffs and defendants, policymakers and other interested parties.  Risk managers use this information to assess the likely exposure associated with potential future litigation and, on this basis, to determine appropriate director and officer insurance premiums.  Lawyers for defendants, plaintiffs and insurance companies involved in shareholder class actions use the results presented here to estimate the likely settlement in ongoing litigation, which can be a valuable tool in settlement negotiations and analysis of appropriate fee requests.  Policymakers use these results to draw conclusions in the debate over litigation reform.

In the realm of policy, the Private Securities Litigation Reform Act of 1995 (hereafter, "the Reform Act") made a number of significant changes to the securities laws. Changes that are likely to affect the filing and settlement of securities class actions are: (1) the new rules governing the appointment of lead plaintiff; (2) the stay of discovery pending a motion to dismiss; (3) the adoption of proportionate liability under certain circumstances; (4) the implementation of a 90-day bounce-back rule when measuring damages; and (5) the addition of negative causation to the statutory language under Section 12.

This study, which we hope will offer some insight on the likely effects of the new securities laws on the number and pattern of filings, as well as on the size and characteristics of settlements, differs from our earlier analyses in three ways:

(1)     we have included cases that reached a disposition between January 1995 and June 1996, thereby extending the sample for which we calculate investor losses from January 1991 through June 1996;

(2)     we have expanded the database of cases for which we have actual plaintiffs' claimed damages and performed additional analyses with this sample; and

- 2 -

(3)    we have added a database of state and federal filings of lawsuits filed from January 1991 through October 1996.

The expanded and updated dataset allows us to offer insights on questions of importance to the shareholder litigation debate.  For example:

(1)    do variables presumably related to merit have a statistically significant effect on settlement values?

(2)    do variables that should, in theory, be unrelated to merit (such as availability of insurance assets, inherent volatility of the stock and the circuit in which the suit was brought) explain case disposition?

(3)    has the Reform Act affected the number of suits filed or influenced settlement negotiations?

## II.    DESCRIPTIVE ANALYSIS OF CASE FILINGS

### A.    Data

*Securities Class Action Alert (SCAA)* is the primary source of our data on case filings. This filing data was collected from monthly issues of *SCAA* published between January 1991 and October 1996 along with additional data compiled by *SCAA*.  Federal court filings are generally reported within a month of a complaint's filing and state court filings generally within two to three months.[1]  Additional filings were collected from Securities Class Action Clearinghouse (which covers filings since passage of the Reform Act) and *Bloomberg, L.P.* (for September and October 1996, since there is a lag in reporting by *SCAA*).

---

[1]    To test this data source for completeness of coverage, we searched the news database of Dow Jones & Co. (Dow Jones News Service and *The Wall Street Journal*) for filings in December 1995 through February 1996 and the news database of *Bloomberg, L.P.* for the months of July and August 1996.  We found that all filings reported by Dow Jones and *Bloomberg, L.P.* were contained in *SCAA*'s database.

- 12 -

shareholder litigation reform. Consistent with the results in Grundfest's study, the sample of cases for which we have plaintiffs' claimed damages indicates that 20 percent settled for less than $2 million (Table 8a). The ratio of awards to claimed damages has a mean and dispersion similar to the larger investor losses sample described below.[16]

In Table 8b, we examine the sample of cases for which we calculated investor losses and find, similarly, that about 26 percent of the settlements between 1991 and June 1996 are less than $2 million. As in the plaintiffs' claimed damages analysis, our data also reveal that many of these cases settle for a lower proportion of investor losses than suits with higher absolute settlements (Figure 5).

We estimate that at least 21 percent, and possibly 42 percent of these low-value settlements may well be nuisance suits, and are likely settling for nuisance value. We first note that about 9 percent of settlements are for less than $1 million. Of these, about two-thirds settle for an amount that is a much smaller fraction of total investor losses than the average for the whole sample. Most of the rest of the suits with settlements under $2 million also settle at less than the average percentage of investor losses but only about a third of them are at a much smaller fraction of total investor losses than the average for the whole sample. Notably, we find that the average settlement as a percentage of investor losses for the settlements between $1 million and $2 million is also lower than the average for the full sample.

E.   **Plaintiffs' Attorneys' Fees**

In Table 9, we present the fees (and fees and expenses, when known) allocated to plaintiffs' attorneys. Not much here has changed over the past several years. Regardless of case

---

(...cont'd)
avoidable defense costs unless the defendant recognizes some probability, however small, that a jury will rule in plaintiffs' favor." Joseph A. Grundfest, "Why Disimply?" *Harvard Law Review*, Vol. 108, 1995, pp. 740-741.

[16]   Low value suits are not necessarily indicative of a lack of merit. For example, these settlements may represent the efficient outcome of negotiations between plaintiffs and defendants in cases where a jury trial would be particularly costly or risky. For a more detailed description of the theoretical reasoning, see Dunbar, et al., October 1995.

size, fees average approximately 32 percent of the settlement. This finding holds even for cases with settlements in excess of $50 million. For the period 1991 through June 1996, fees to plaintiffs' attorneys (in cases where fees could be separated from expenses) total $1 billion.

Cases for which an aggregated figure for fees and expenses was reported are presented in the bottom half of Table 9. In contrast to the findings for fees alone, the total of fees and expenses decline as a percentage of settlement value when settlement value exceeds $50 million. This result may indicate that expenses are relatively independent of size of settlement; that is, a case with a large settlement incurs about the same expenses as a small case. Given the small sample of cases in this category, however, we cannot draw any general conclusions about the pattern of expenses.

F.   **Case Dispositions and Filings by Defendants' Primary Industry**

As is apparent from Table 10a, high-technology companies are a major focus of securities fraud class actions. In the past, almost one-third of the settlements have come from this sector. However, in 1995, only 27 percent of settlements came from the high-technology sector, down from 34 percent in 1994. And, so far in 1996, the percentage of settlements by high-technology companies has slowed considerably to 15 percent. In addition, as Table 10b demonstrates, dismissals as a percent of all dispositions in this sector are somewhat higher than the average dismissal rate. So although cases continue to be filed in this sector more than ever, either plaintiffs or defendants seem to be waiting to settle, perhaps waiting for a motion to dismiss to be decided.

Over the past six months, approximately 10 percent of settlements involved the financial and insurance sector (a group that excludes commercial banking), the highest percentage settled in this industry over the 1991 to 1996 time period. Similarly, filings in this sector over the past 10 months are at a higher percentage of the total filings than they have been since 1994. Also, as Table 10b demonstrates, dismissals as a percent of dispositions in this sector run at a much higher rate than the average dismissal rate and than the rate for other sectors we have classified. The data also suggest that plaintiffs' attorneys' fees as a percentage of the settlement

## Table 9

### Plaintiffs' Attorney Fees[8,9,10]

| Settlement Range | Number of Settlements | Total Value of Settlements | Total Attorney Fees | Average Attorney Fees as a Percentage of Settlement | Median Attorney Fees as a Percentage of Settlement |
|---|---|---|---|---|---|
| | | ---------(Dollars)--------- | | ----------(Percent)---------- | |
| | (1) | (2) | (3) | (4) | (5) |
| $0.00 - $0.99 million | 37 | $ 24,696,750 | $ 7,617,600 | 30.38% | 30.00% |
| $1.00 - $1.99 million | 66 | 96,506,502 | 30,642,005 | 31.88 | 33.33 |
| $2.00 - $9.99 million | 245 | 1,184,141,901 | 381,149,262 | 32.11 | 33.33 |
| $10.00 - $49.99 million | 76 | 1,488,892,280 | 471,161,635 | 31.72 | 33.15 |
| $50+ million | 9 | 571,650,000 | 179,920,000 | 31.48 | 30.00 |
| Total | 433 | $ 3,365,887,433 | $ 1,070,490,502 | 31.84% | 33.33% |

### Plaintiffs' Attorney Fees and Expenses[8,10,13]

| Settlement Range | Number of Settlements | Total Value of Settlements | Total Attorney Fees and Expenses | Average Attorney Fees and Expenses as a Percentage of Settlement | Median Attorney Fees and Expenses as a Percentage of Settlement |
|---|---|---|---|---|---|
| | | ---------(Dollars)--------- | | ----------(Percent)---------- | |
| | (1) | (2) | (3) | (4) | (5) |
| $0.00 - $0.99 million | 12 | $ 8,340,000 | $ 2,930,867 | 35.86% | 34.17% |
| $1.00 - $1.99 million | 10 | 14,600,000 | 4,625,958 | 32.02 | 31.67 |
| $2.00 - $9.99 million | 51 | 254,692,708 | 90,703,632 | 35.63 | 36.21 |
| $10.00 - $49.99 million | 31 | 575,640,000 | 208,189,333 | 35.84 | 33.33 |
| $50+ million | 3 | 194,000,000 | 39,625,000 | 20.05 | 18.80 |
| Total | 107 | $ 1,047,272,708 | $ 346,074,790 | 34.94% | 34.64% |