EXHIBIT 2

# Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules

*Thomas E. Willging, Laural L. Hooper & Robert J. Niemic*

Federal Judicial Center

1996

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to conduct and stimulate research and development for the improvement of judicial administration. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

# Introduction

Federal Rule of Civil Procedure 23, an outgrowth of an equity rule, was promulgated in 1938 as part of the first Federal Rules of Civil Procedure.[1] The current version of the rule creates a procedure designed to permit representative parties and their counsel to prosecute or defend civil actions on behalf of a class or putative class consisting of numerous parties. Rule 23 was last amended in 1966. The Judicial Conference Advisory Committee on Civil Rules is currently considering proposals to amend Rule 23.

## The Rule 23 Debate in Historical Perspective

Creating a workable procedural standard for class actions has challenged rule makers since the first draft was published in 1937.[2] The 1966 amendments to Rule 23 sparked a "holy war"[3] over the rule's creation of opt-out classes. Opinions became polarized, with class action proponents seeing the rule as "a panacea for a myriad of social ills" and opponents seeing the rule as "a form of 'legalized blackmail' or a 'Frankenstein Monster.'"[4]

Apparently anticipating debate about the 1966 amendments to Rule 23, Professor Benjamin Kaplan, then reporter to the advisory committee that drafted those amendments, was quoted as saying that "it will take a generation or so before we can fully appreciate the scope, the virtues, and the vices of the new Rule 23."[5] Respect for Professor Kaplan's caution may have dampened any advisory committee interest in revisiting Rule 23.[6] Now, a generation has passed and the current advisory committee has returned its attention to the hotly debated policy issues under-

---

1. Fed. R. Civ. P. 23, Advisory Committee Note to 1937 adoption (West ed. 1994). The U.S. Supreme Court adopted the Federal Rules of Civil Procedure on December 20, 1937, and ordered them to be reported to Congress at the beginning of the January 1938 session. Fed. R. Civ. P. at 8 (West ed. 1994).

2. *See* James W. Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft*, 25 Geo. L.J. 551, 571 (1937) ("It is difficult, however, to appraise the various problems involved and state a technically sound and thoroughly workable rule" for class actions.).

3. Arthur R. Miller, *Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem*,*"* 92 Harv. L. Rev. 664 (1979).

4. *Id.* at 665.

5. Marvin E. Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 52 (1967) (paraphrasing Professor Kaplan).

6. *See, e.g.*, Edward H. Cooper, Rule 23: Challenges to the Rulemaking Process 1 (Apr. 21, 1995) (unpublished draft paper presented at NYU Research Conference on Class Actions and Related Issues in Complex Litigation, on file at the Research Division, Federal Judicial Center) (an unspoken barrier shielded Rule 23 from Advisory Committee scrutiny for many years). A later version of Professor Cooper's paper has been circulated and is expected to be published in a spring 1996 symposium on class actions in the NYU Law Review.

lying the procedural framework of Rule 23. This report to the advisory committee addresses many of the empirical questions underlying those policy issues.

After the 1966 amendments, the emergence of mass torts as potential class actions has added fuel to the debate because of the high stakes inherent in that type of litigation. But the issues remain similar.[7] Broadly stated, three central issues permeate the debate. First, does the aggregation of numerous individual claims into a class coerce settlement by raising the stakes of the litigation beyond the resources of the defendant?[8] Second, does the class action device produce benefits for individual class members and the public—and not just to the lawyers who file them? And, finally, do those benefits outweigh the burdens imposed on the courts and on those litigants who oppose the class?[9]

In 1985 a Special Committee on Class Action Improvements of the American Bar Association's Section of Litigation articulated a list of recommended revisions of Rule 23 and called it to the attention of the advisory committee.[10] The ABA special committee found that "the class action is a valuable procedural tool" and recommended changes so that such actions would not "be thwarted by unwieldy or unnecessarily expensive procedural requirements."[11] Recommended changes included collapsing the three categories of class actions into one, expanding judicial discretion to modify the notice requirements, authorizing precertification rulings on motions to dismiss and motions for summary judgment, and permitting discretionary interlocutory appellate review of rulings on class certification.[12]

In March 1991, the Judicial Conference of the United States acted on a report of its Ad Hoc Committee on Asbestos Litigation. The Judicial Conference requested "the Standing Committee on Rules of Practice and Procedure to direct its Advisory Committee on Civil Rules to study whether Rule 23 of the Federal Rules of Civil Procedure should be amended to accommodate the demands of mass tort litigation."[13] Given these developments, the advisory committee drafted a proposed revision of Rule 23, based primarily on the ABA special committee's 1985 recommendations. Professor Edward H. Cooper, reporter to the advisory committee, circulated this draft to "civil procedure buffs," including academics, lawyers, interest groups, and bar organizations.[14] Many of the responses questioned the need for change and suggested that changes might upset settled practices and make matters worse.[15]

---

7. *See, e.g.*, Roger H. Transgrud, *Mass Trials in Mass Tort Cases: A Dissent*, 1989 U. Ill. L. Rev. 69, 74 (raising issues of fairness to litigants and coercion of settlements in mass torts).

8. *See, e.g.*, Staff of the Subcomm. on Securities, Senate Comm. on Banking, Housing and Urban Affairs, 103d Cong., 2d Sess., Private Securities Litigation 7–8 (May 17, 1994) [hereinafter Senate Staff Report].

9. *Id.; see also* Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 Stan. L. Rev. 497 (1991) (regardless of the merits of the claims on which they are based, settlements in securities class actions produce returns of only about 25% of the potential loss).

10. American Bar Association Section of Litigation, *Report and Recommendations of the Special Committee on Class Action Improvements*, 110 F.R.D. 195 (1986) [hereinafter ABA Special Committee Report]. The House of Delegates of the ABA authorized the Section of Litigation to transmit the report to the Advisory Committee but neither approved nor disapproved its recommendations. *Id.* at 196.

11. *Id.* at 198.

12. *Id.* at 199–200.

13. Judicial Conference of the United States, Ad Hoc Asbestos Committee Report 2 (March 1991).

14. Memorandum from Professor Edward H. Cooper to "Civil Procedure Buffs" (Jan. 21, 1993) (on file at the Research Division, Federal Judicial Center). A copy of the 1993 version of the Advisory Committee's proposed Rule

Legislative proposals to modify Rule 23 have paralleled the rule-making policy debates over the past twenty years.[16] As a recent example, in December 1995, Congress overrode a presidential veto and adopted legislation designed to alter substantive and procedural aspects of securities class actions.[17] This legislation had bipartisan support and was an outgrowth of hearings and an extensive staff report in 1994.[18] Among other provisions, the statute tightens pleading requirements for securities class actions and directs district judges to stay discovery and all other proceedings until there is a judicial ruling on any pending motion to dismiss for failure to satisfy those heightened pleading requirements.[19] The statute also modifies the notice requirements applicable to the filing and settlement of securities class actions[20] and limits attorneys' fees to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."[21]

## The 1995 FJC Study

The Federal Judicial Center conducted the present study in 1994–1995 at the request of the advisory committee. In general, the committee asked the Center to provide systematic, empirical information about how Rule 23 operates. The study was designed to address a host of questions about the day-to-day administration of Rule 23 in the types of class actions that are ordinarily filed in the federal courts. The research design focused on terminated cases and did not encompass the study of mass tort class actions, which appear to occur relatively infrequently and remain pending for long periods of time.

This report describes the results of the study and addresses many of the issues in the continuing debate about class actions, including those raised by the ABA special committee's recommendations. The principal issues are:

- What portion of class action litigation addresses the type of class to be certified?
- Are judges reluctant to rule on the merits of claims before ruling on class certification?
- Does filing of a case as a class action or certifying a class coerce settlement without regard to the merits of the claims?
- How well does the notice process work and who bears its costs?
- In what ways do class representatives and individual class members participate in the litigation?

23 is attached as Appendix A. A copy of the November 1995 draft of proposed Rule 23 is included as Appendix B.

15. Cooper, *supra* note 6, at 1.

16. For example, the 95th and 96th Congresses considered proposals to amend Rule 23 at the behest of the U.S. Department of Justice, Office for Improvements in the Administration of Justice. *See* S. 3475, 95th Cong., 2d Sess. (1978), and H.R. 5103, 96th Cong., 1st Sess., Tit. I (1979). For further discussion of this proposal, see Stephen Berry, *Ending Substance's Indenture to Procedure: The Imperative for Comprehensive Revision of the Class Damage Action,* 80 Colum. L. Rev. 299 (1980) (evaluating H.R. 5103 to determine whether it satisfies the goals of improving the efficiency of small damage claim actions while protecting the interests of defendants and absent parties).

17. Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995).

18. See Senate Staff Report, *supra* note 8, for a discussion of the issues raised at the hearings.

19. Private Securities Litigation Reform Act of 1995, 15 U.S.C.A. § 77z-1(b) (West Supp. 1996).

20. *Id.* § 77z-1(a)(3), (a)(7).

21. *Id.* § 77z-1(a)(6).

- In cases that settle, how do the benefits to the class compare to the benefits to the class attorneys? How extensive is the class action plaintiffs' bar?
- How well does the appellate process work and how might discretionary interlocutory appeals of rulings on class certification affect the fairness of the process?

Such questions—and more—are incorporated in Professor Edward Cooper's April 1995 report to the advisory committee and conferees at New York University Law School's Research Conference on Class Actions.[22] Our report parallels Professor Cooper's report in that we have presented study data and analyses to correspond with his questions as closely as possible.[23] Where relevant, we present general background on the state of the law, often focusing on recent decisions in the circuits where study cases were filed.

## Study Design and Methods

We selected for analysis as class actions closed cases in which the plaintiff alleged a class action in the complaint or in which plaintiff, defendant, or the court initiated class action activity, such as a motion or order to certify a class. This report presents empirical data on all class actions terminated between July 1, 1992, and June 30, 1994, in four federal district courts: the Eastern District of Pennsylvania (E.D. Pa., headquartered in Philadelphia), the Southern District of Florida (S.D. Fla., headquartered in Miami), the Northern District of Illinois (N.D. Ill., headquartered in Chicago), and the Northern District of California (N.D. Cal., headquartered in San Francisco).[24]

We identified class actions meeting these selection criteria by a multistep screening process that included reviewing electronic court docket records, statistical records maintained by the Administrative Office of the U.S. Courts, and published opinions. We then reviewed all cases that were candidates for inclusion in the study.[25] For each case meeting study criteria, we examined court records and systematically entered appropriate case information into a computerized database. These data were then analyzed by the same attorney researchers who collected the data. In addition, we reviewed data about class actions from the Federal Judicial Center's 1987–1990 district court time study;[26] those data are summarized at relevant parts of this report.[27]

---

22. Cooper, *supra* note 6.

23. Our headings and subheadings generally follow the structure of Professor Cooper's paper, but occasionally we have adapted the titles or rearranged the parts to present the data more clearly.

24. Cases in the study represent a termination cohort, i.e., a group of cases that were selected because they were concluded within the same time period. Termination cohorts sometimes present problems of biased data if recent filing trends show fluctuations. Because of the limitations of class action filing data we have not been able to test filing trends as thoroughly as we would like. On the other hand, we have no reason to believe that the use of a termination cohort presents serious problems for these data. *See* Appendix D, Methods.

25. See Appendix D for details about the identification of class actions.

26. *See* Thomas E. Willging, et al., Preliminary Report on Time Study Class Action Cases (Feb. 9, 1995) (unpublished report on file with the Information Services Office of the Federal Judicial Center). The time study report includes national data derived from judges' records of the time they spent on the 51 class actions in the study. *See infra* § 2(d) and Table 19. See Appendix D for details about the time study.

27. The current report supplements Willging et al., *supra* note 26, and supersedes our preliminary presentation of data to the advisory committee concerning the first two districts studied. *See* Thomas E. Willging et al., Preliminary Empirical Data on Class Action Activity in the Eastern District of Pennsylvania and the Northern District of

*Class Actions*

We generally used the median (midpoint) to describe the central tendency of the data. We used this statistic because the mean (average) in many instances was inflated by a few extraordinarily large or small values ("outliers").

## Nature of the Data

Several perspectives regarding—and limitations of—the data deserve special mention at the outset. The four districts were not selected to be a scientific sampling of class actions nationwide. Rather, we selected the four districts because available statistical reports on the frequency of class action activity in those districts indicated that we would have the opportunity to examine a relatively large number of cases in those districts. This high volume would allow us to observe a variety of approaches to class actions. Similarly, the selection of districts from four separate geographic regions would enable us to observe any regional differences in approaches and the selection of districts from four circuits would enable us to observe variations in case law. Because this study did not employ random sampling or control or comparison groups, our results cannot and should not be viewed as representative of all federal district courts nor should causal inferences be drawn from the data. On the other hand, we have no reason or data that would lead us to believe that these districts are unusual or that they present a picture that is radically different from what one would expect to find in other large metropolitan districts.

Each district should be viewed as a separate entity and the data from the four districts should be viewed as descriptive—four separate snapshots of recent class action activity. Generally, data from the four districts should not be aggregated. Occasionally, when the number of cases on a given subject is quite small, we discuss combined data from the four districts for descriptive purposes only, but no inference should be drawn that these data are necessarily representative of all courts.[28]

California in Cases Closed Between July 1, 1992, and June 30, 1994 (rev. Apr. 13, 1995) (unpublished preliminary report on file with the Information Services Office of the Federal Judicial Center).

28. For example, when discussing subject matter (nature-of-suit) categories of cases in relation to infrequent events, we present the data in figures with a caution that no overall conclusions can be drawn from them.

# Summary of Findings

Overall, we identified 407 class actions in the four districts. Of those, 152 were certified as class actions, 59 of which were certified for settlement purposes only.

   **1. Individual Actions and Aggregation.** Across the four districts, the median level of individual recoveries ranged from $315 to $528 and the maximum awards ranged from $1,505 to $5,331 per class member. Without an aggregative procedure like the class action, the average recovery per class member or even the maximum recovery per class member seems unlikely to be enough to support individual actions in most, if not all, of the cases studied.

   Occasionally, other aggregative procedures were used in conjunction with a class action. District court consolidation of related cases occurred more frequently than multidistrict litigation (MDL) consolidation.

   **2. Routine Class Actions.** Securities (b)(3) cases in the four districts exhibited a number of standard characteristics that suggest routineness in the way in which they are litigated and adjudicated. Such cases did not necessarily last longer than nonsecurities class actions, were about as likely to be subject to some form of objection to certification, and did not necessarily yield more dollars to individual class members. Securities cases were, however, more likely to be certified, to be subject to representativeness objections, to involve larger class sizes than nonsecurities cases, and to contain boilerplate allegations. Finally, numerosity objections were unlikely to occur in securities cases, but more likely to occur in other cases.

   We did not find the above pattern of routine litigation practices in nonsecurities cases in which only a Rule 23(b)(2) class was sought. Nor did we find such a pattern in (b)(2) civil rights cases, a subset of the nonsecurities cases. Accordingly, we concluded that we cannot generalize about whether these types of (b)(2) cases represented routine applications of Rule 23.

   Comparing class and nonclass settlement and trial rates as possible indicators of routineness, the settlement rate for other nonprisoner class actions was comparable to the settlement rate for nonprisoner civil actions, but no consistent pattern was detected across the four districts. The settlement rate for securities class actions was higher than for nonclass securities actions in three of the four districts. Trial rates (jury and bench), however, were generally about the same for all nonprisoner civil cases whether or not they were filed as class actions.

   Despite similarities with nonclass cases in settlement and trial rates and despite some standardization of arguments and certification decisions in securities cases, class actions as a group do not appear to be routine cases according to two other measures. In three districts, class actions took two to three times the median time from filing to disposition (15–16 months compared to 5–6 months). In a national time study, certified and noncertified class actions on average consumed almost five times more judicial time than the typical civil case. Both these meas-

ures suggest that class actions are not routine in their longevity or in their demands on the courts.

The most frequently certified class was the Rule 23(b)(3) or "opt-out class," which occurred in roughly 50% to 85% of the certified classes in the four districts. The second most frequently certified class was the Rule 23(b)(2) or "injunctive class," which occurred in 17% to 44% of the certified classes. Rule 23(b)(1) "mandatory" classes were certified in a total of fourteen cases in three districts.

A securities case was the most likely case type to be certified as a (b)(3) class, while civil rights cases of various types were most likely to be certified as (b)(2) classes. Certification under more than one 23(b) subsection occurred in about 10% of the certified classes. The most frequent multiple certification combination was (b)(2) and (b)(3).

3. **Race to File.** Multiple filings of related class actions might indicate a race by counsel to the courthouse, perhaps to gain appointment as lead counsel. We found the following multiple filings: intradistrict consolidations, MDL consolidations, and related but unconsolidated cases. At least one form of multiple filing occurred in 20% to 39% of the class actions in the four districts.

On a related issue, it did not appear that many class action complaints were filed quickly for the ostensible purpose of preserving discoverable information.

4. **Class Representatives.** We did not find any evidence of professional class action plaintiffs. Very few persons functioned as a class representative in more than one case and none served in that capacity in more than two cases in the study. There were, however, changes in class representatives in 8% to 33% of certified class actions. Many of the changes appeared to signify a significant shift in the litigation or the removal of a person in response to arguments of opposing parties or objections of nonrepresentative parties. A substantial minority (26% to 46%) of all certified class actions in which the court approved a settlement included separately designated awards to the named class representatives. The median award per representative was under $3,000 in three courts and $7,560 in the fourth.

5. **Time of Certification.** Counsel filed motions to certify—or courts issued show cause orders for sua sponte certification—in the four districts within median times of 3.1 months to 4.3 months after the filing of the complaint. Judges ruled on motions to certify within median times of 2.8 months to 8.5 months after the date of the motion.

Parties often filed motions to dismiss or for summary judgment and judges generally ruled on those motions in a timely fashion, often dismissing a case in whole or in part. These rulings on the merits often preceded rulings on class certification, with the rate of precertification rulings on motions to dismiss being higher than the rate for summary judgment motions (although there were some precertification rulings on summary judgment motions in all four districts).

Overall, approximately two out of three cases in each of the four districts had a ruling on either a motion to dismiss, a motion for summary judgment, or a sua sponte dismissal order. Approximately three of ten cases in each district were terminated as the direct result of a ruling on a motion to dismiss or for summary judgment.

As to the timing of such rulings, defendants generally had an opportunity to test the merits of the litigation and obtained prompt judicial rulings on motions to dismiss. Not surprisingly, testing the factual sufficiency of claims via summary judgment took longer—sometimes more than a year—than obtaining rulings on motions to dismiss.

**6. Certification Disputes.** Across the four districts, 152 (37%) of the 407 cases filed as class actions were certified as such. Fifty-nine (39%) of the certified cases were certified for settlement purposes only. About 40% of the latter cases were settlement classes, that is, cases in which the parties submitted a proposed settlement to the court before or simultaneously with the first motion to certify a class.

In three of the four courts, opposition to certification was indicated in over half of the cases in which class certification was raised. Most arguments centered on traditional issues relating to the typicality, commonality, and named plaintiffs' representativeness. Opposition infrequently addressed the subtype of Rule 23(b) class to be certified; approximately 15% of judicial rulings granting class certification addressed the type of class certified. (See also sections 2 and 9 of this Summary.)

**7. Plaintiff Classes.** Defendants almost never sought certification of a plaintiff class and were successful in having a plaintiff class certified in only one instance. In half of the 152 certified cases, defendants acquiesced in a plaintiff class either by failing to oppose a motion to certify or by stipulating to certification.

**8. Defendant Classes.** Across the four districts, there were a total of four motions requesting certification of a defendant class, three filed by plaintiffs and one filed by defendants. One defendant class was certified, at plaintiffs' request, in a civil rights case.

**9. Issues Classes and Subclasses.** There were no issues classes in any of the four districts. Subclasses were infrequent, appearing in ten cases, five of which were securities cases.

The ability of the named plaintiff to represent the class was frequently disputed because of a potential conflict of interest with other class members. But disputes regarding the typicality of class representatives' claims were less frequent.

**10. Notice.** Notice of class certification or notice of settlement or voluntary dismissal was sent to class members in at least three-quarters or more of the certified class actions. Notice was delayed in a substantial number of cases. While the reason for the delays could not be determined, one consequence of the delays was to postpone notice expenses until the case had been resolved and such expenses could be shifted to the defendant. In a dozen cases, half of which were settlement classes, neither notice to the class nor hearing on settlement approval appeared to have taken place.

Parties and judges provided individual notice in almost all certified (b)(3) actions in which notice was issued. In at least two-thirds of the cases in each district, individual notices were supplemented by publication in a newspaper or other print medium.

The median number of recipients of notice of certification or settlement (or both) was substantial, ranging from approximately 3,000 individuals in one district to over 15,000 in another. In many cases plaintiffs and defendants shared the cost of notices. Across the four districts, the median cost of notice in the limited number of cases with data available exceeded $36,000 for notice of certification or settlement or both. Litigation related to notice issues occurred in less than one-quarter of the certified cases in which notice was communicated to the class.

Settlement notices generally did not provide either the net amount of the settlement or the estimated size of the class. A class member typically did not have the information with which to estimate his or her individual recovery. Also missing from most notices was information about the amount of attorneys' fees, costs of administration, and other expenses. Usually, however, notices included sufficient information about plans to distribute settlement funds, procedures

for filing claims, opt-out procedures, and the timetable for filing objections and participating in hearings.

**11. Opt Outs.** At the settlement stage, the percentage of cases with at least one member opting out was considerably higher than at the certification stage. The occurrence of at least one member opting out of a settlement ranged from 36% to 58% of the cases compared to 9% to 21% with at least one member opting out of a certification before settlement.

Across all four districts, the median percentage of members who opted out of a settlement was either 0.1% or 0.2% of the total membership of the class; 75% of the opt-out cases had 1.2% or fewer of class members opt out. Settlements with small average individual recoveries had a higher number of cases with one or more opt outs than cases with larger average individual recoveries.

**12. Opt Ins.** None of the certified class actions required that class members file a claim as a precondition to class membership. Many cases in the study used a claims procedure to distribute any settlement fund to class members. Claims procedures were used routinely in securities class actions. The effect of combining a claims procedure with an opt-out class appeared to be that a class member who did not opt out or file a claim was nonetheless precluded from litigating class issues in the future.

**13. Individual Member and Nonmember Participation.** Attempts to intervene in cases filed as class actions occurred relatively infrequently. Following rulings rejecting an attempt to intervene, three prospective intervenors filed appeals challenging that decision, but none was successful. Prospective intervenors also filed three appeals addressing other issues—again without success. In addition, objecting class members filed appeals of settlements in two major consumer class actions.

Overall, about half of the settlements that were the subject of a hearing generated at least one objection. Nonrepresentative parties participated by filing written objections to the settlement far more frequently than by attending the settlement hearing. Courts approved approximately 90% or more of the proposed settlements without changes in each district. In a small percentage of cases, the court conditioned settlement approval on the inclusion of specified changes.

**14. Settlement.** In each district, a substantial majority of certified class actions were terminated by class-wide settlements. Certified class actions were two to five times more likely to settle than cases that contained class allegations but were never certified. Certified class actions were less likely than noncertified cases to be terminated by traditional rulings on motions or trials. The vast majority of cases that were certified as class actions had also been the subject of rulings on motions to dismiss or for summary judgment, most of which did not result in dismissal or judgment. But noncertified cases were not simply abandoned; in each district, they were at least twice as likely as certified class actions to be disposed of by motion or trial (mostly by motion). Overall, about half of the noncertified cases were disposed of by motion or trial.

As to the relationship between class certification and settlement, many cases settled before the court ruled on certification. At the other end of the spectrum, a sizable number—a majority in three of the districts—settled more than a year after certification.

Special masters were never used to evaluate settlements and in only one case was a master used to facilitate settlement. Magistrate judges were used occasionally to evaluate a settlement and more frequently to facilitate settlement.

*Class Actions*

**15. Trials.** The number of trials in study cases was small; a trial began in only 18 (4%) of the 407 cases in the four districts combined. Plaintiff classes and individual plaintiffs did not fare well at trial. Except for one default judgment that led to a class settlement, no trial resulted in a final judgment for a plaintiff class. Of the three trials that found for individual plaintiffs, one judgment was vacated and remanded for dismissal, one judgment was vacated with a resulting $1 damage award for the plaintiff on remand, and one defendant's appeal was dismissed. Five of the 18 trials led to settlement during or after trial, including the default judgment case mentioned above, two certified cases that settled after partial judgments for the class, and two non-certified cases.

**16. Fee-Recovery Ratios.** Net monetary distributions to the class regularly exceeded attorneys' fees by substantial margins. In cases where benefits to the class can readily be quantified, the "fee-recovery rate" (fee awards as a percentage of the gross settlement amount) infrequently exceeded the traditional 33.3% contingency fee rate.

When a settlement created a fund for distribution to the class, three of the four districts calculated fees using the percentage of recovery method far more often than the lodestar method. Not surprisingly, courts generally used the lodestar method in cases where the class settlement produced nonquantifiable benefits. Judges appeared to attach special importance to actual benefits won for the class when calculating fees, either by using the percentage of the recovery method, considering fee objections, or adjusting the lodestar calculation.

Four or fewer appeals per district involved attorneys' fees issues. All fee-related appeals related to plaintiffs' counsel fees, including challenges to the amount of the award, denial of the fee request, or reduction of the fee request. For the four districts combined, only one of the fee-related appeals resulted in vacating a fee award. The other appeals ended in fee-award affirmance (two cases), appeal dismissal (two cases), reversal of denial of fees (one case), vacating the trial court's reduction of fees (one case), and remanding for reconsideration (one case).

**17. Trivial Remedies; Other Remedies.** We did not find any patterns of situations where (b)(3) actions produced nominal class benefits in relation to attorneys' fees. Nor did we find any (b)(2) cases that appeared to result in clearly trivial injunctive relief accompanied by high fees. The fee-recovery rate, as described above, exceeded 40% in 11% or fewer of settled cases, half of which included nonquantifiable benefits such as a permanent injunction. In the balance of cases with high fee-recovery rates, the settlement produced relatively small payments to the class as well as to attorneys for the class.

In five cases in two districts, a portion of the settlement funds was distributed to a charitable or other nonprofit organization.

**18. Duplicate or Overlapping Classes.** We found five duplicative or overlapping classes in related cases that were not consolidated with similar litigation pending in federal and state courts. Our review of the files indicated that those cases generated few difficulties for the court.

**19. Res Judicata.** No data were available.

**20. Appeals.** The rate of filing at least one appeal ranged from 15% to 34%. Noncertified cases were more likely to have one or more appeals than certified cases. Cases with trials showed even a higher rate of appeal. Few appeals led to altering the decision of the trial judge at the appellate level or on remand. Class certification before appeal, however, may have been one of the factors that led to settlement in cases that settled on remand.

*Summary of Findings*                                                                                      11

Plaintiffs filed 75% to 85% of the appeals and were rarely successful in reversing or vacating trial court decisions. On the other hand, defendants rarely filed appeals; their appeals also did not lead to a high rate of reversal or vacation. Among appeals resulting in full or partial reversal on appeal, most reversals significantly changed the direction of the case. For appeals in cases that had been previously certified, reversal and remand generally resulted in a class settlement, although there were only seven such reversals in the study. On the other hand, reversal and remand in thirteen cases not previously certified generally did not lead to a successful outcome for the plaintiffs.

Parties rarely sought appellate review of district court decisions that dealt with the mechanics of the class action process, such as certification or class settlement. Litigants appealed certification decisions in seven study cases. Two cases involved certified classes. In one, the certification of a class was affirmed and, in the other, class certification was vacated. In the other five cases, putative class representatives appealed the denial of class certification. Three of these five appeals were unsuccessful. The fourth resulted in reversal and remand that led to class certification and the fifth resulted in dismissal with no class certified.

**21. Class Action Attorneys.** In 156 cases, 160 different law firms served as lead, co-lead, or liaison counsel, with more than 1 firm appointed in most cases. Twelve of these law firms served as lead or co-lead counsel in 4 or more cases. In total, these 12 firms appeared 95 cases, 63% of the certified cases in the study.

*Class Actions*

**(b) How did class action trial rates compare with trial rates for all other civil cases within the district?**

As discussed *supra*, in section 2(b), the rate of trial (jury and bench) for class actions and other civil cases was in the 3% to 6% range in the four districts (see Table 16).

## (16) Fee/Recovery Rates

*Overview.* An overarching question concerning attorneys' fees is whether, in addition to conferring benefits on attorneys, class action outcomes confer substantial benefits on class members. *The major questions posed in this section are: What were the ratios of attorneys' fees to recoveries? What methods other than lodestar have courts used to regulate fees? To what extent have methods of fee regulation taken into account the benefit to the class?*

### (a) What were the ratios of attorneys' fees to recoveries?

*Background.* Professor Cooper has referred to the "cynical belief" that "many class actions serve only to confer benefits on class counsel."[240] To address this issue, we computed a "fee-recovery rate" (attorneys' fee awards[241] divided by gross monetary settlement[242]) for certified class actions where the court approved a settlement.[243] This rate is meaningful only in "distribution cases," cases where some form of monetary benefit was available for distribution to class members after payment of attorneys' fees and expenses, notice costs, and other administrative expenses. Interestingly, in two districts 82% of certified cases that settled were distribution cases, but the comparable figure in the other two courts was 53%.[244]

*Data and Discussion.* There were no fee awards to, and few fee requests by, counsel other than plaintiffs' counsel.[245] In most cases, net monetary distributions to the class exceeded at-

---

240. Cooper, *supra* note 6, at 34. Some argue that class counsel at times receive large fees from settlements that provide nominal benefits or only speculative benefits to the class. *See* MCL 3d, *supra* note 34, § 30.42, at 239–40. *See also* Senate Staff Report, *supra* note 8, at 73–74.

241. Fee awards exclude sanctions and out-of-pocket expenses.

242. Gross monetary settlement includes any cash payments or quantifiable benefits to class members, separate payments to class representatives, donations to charities or public interest groups, attorneys' fees and expenses awarded by the court, and administrative costs of the settlement.

243. No case that went to trial and did not settle resulted in a final judgment or verdict in favor of a class. *See supra* § 15(a).

244. In the balance of certified and settled cases, the class received some form of equitable relief, coupons, price reductions, or other benefits that the court could not quantify, that the parties did not quantify, or that led to unresolved disputes concerning value in the litigation or on appeal. We refer to these as "no distribution cases." In the *General Motors Pick-Up Truck Litigation*, the principal settlement (vacated on appeal) consisted of distribution of $1,000 coupon certificates to an estimated 5–6 million class members. Objecting class members placed economic value on the coupon distribution that differed significantly from defendant's estimates. *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 807 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995). The fee award, vacated on appeal, was $9.5 million. *Id.* at 822.

Sometimes litigants settled on liability issues but left each class member's claim to be determined individually, such that the total amount to be distributed to the class was not known at the time of the fee award. For example, under the claims resolution procedure in one settled case, class members who filed valid claims could receive 100% of the medical insurance benefits due to them for certain medical services. The settlement did not place a dollar limit on claim recoveries. Fee awards totaled $3.7 million.

245. Defendants' counsel unsuccessfully requested fees in one case each in three districts; case files did not con-

torneys' fees by substantial margins. The fee-recovery rate infrequently exceeded the traditional 33.3% contingency fee rate. Median rates ranged from 27% to 30%. Most fee awards in the study were between 20% and 40% of the gross monetary settlement (see Figures 67 and 68).[246]

Some distribution cases also included other class relief that the court did not quantify.[247] This occurred about a third of the time in two districts and about 17% and 25% of the time in the other two courts. To the extent that monetary value can be associated with that relief, the data presented in this subsection understate the value of gross settlement and thus possibly overstate fee-recovery rates.

The fee-recovery rate calculations discussed in this subsection do not include cases with no net monetary distribution to class members (no distribution cases), because those settlements contained only equitable or other nonquantifiable relief. Fees and costs comprised all or a large percentage of the settlement funds in those cases.[248]

## (b) How were fees calculated?

*Background.* In most study cases—as in most class actions generally—the court awarded attorneys' fees under the century-old common fund doctrine.[249] Traditionally, in determining fees in common fund cases, courts included the size of the fund as a principal factor and frequently

tain the amounts sought. Parties other than plaintiffs or defendants requested fees in two cases in only one district. The first was a $300,000 fee application by nonlead counsel relating to legal services performed before the court appointed lead counsel pursuant to a competitive bidding process. Although the court declined to award the requested fees from the settlement fund, the order stated that nonlead counsel might be entitled to fees on the basis of *quantum meruit.* In the other case, counsel for an objecting class member unsuccessfully requested $131,000 in fees.

246. In one district, N.D. Cal., the median fee award to class counsel was $1.5 million, with an average fee award of approximately $2.5 million. In the other three districts, the median and average fee awards were smaller—with medians ranging between $0.6 million and approximately $1 million and averages from just under $0.75 million to approximately $1.4 million (see Figure 69). However, the N.D. Cal. average fee award was within the range of the other three districts if one excludes the district's largest fee award ($13.9 million).

N.D. Cal. also had the highest median ($5.1 million) and average ($10 million) gross monetary settlement. In comparison, the other three districts' median settlement amounts were between just under $2 million and approximately $3 million, with average amounts between $3.2 and $4.7 million (see Figure 70). For N.D. Cal., even if the largest settlement ($73.6 million) is excluded, the district still had a comparatively large mean settlement amount ($7.2 million). However, some perspective is offered by looking at the district's average gross monetary settlement per notice sent, which was only slightly above the comparable average for the other three districts combined.

247. For example, in one case, class counsel valued the settlement's "noncash" benefits at $8.3 million in addition to the $9.9 million monetary distribution. In another case, the defendant supplemented the $487,000 monetary distribution by agreeing to implement practices designed to increase the representation of women and African-Americans in its workforce.

248. *See supra* note 244. Typically, the only payments defendants made in these cases were to attorneys, class representatives, and noticing companies. We will refer to these payments collectively as "settlement costs." Fee awards as a percentage of these settlement costs were 96%, 91%, 88%, and 80% on the average for the four districts (see Table 45). The median percentage of gross settlement amounts attributable to costs of administering the settlement (primarily notice) was 2% across the four districts in the 29 cases for which data were available. In these cases, the median amount of such expenses was $100,000.

249. The principle governing the doctrine is that "persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." Boeing Co. v. Van Gemert, 444 U.S. 472, 478–79 (1980). *See also* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 392 (1970). *See generally* Alan Hirsch & Diane Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation 5-48 & 75-88 (Federal Judicial Center 1994).

based awards on what the court considered to be a reasonable percentage of the fund.[250] In the early 1970s, courts began moving away from this approach toward the lodestar method, under which the fee award is calculated by multiplying the hours reasonably expended times the reasonable hourly rates.[251] In the 1980s, however, the pendulum swung again and courts began to reconsider the lodestar method.[252]

In federal courts today, a threshold question in determining fees in common fund cases is "whether the jurisdiction requires use of the lodestar method or whether it requires, permits, or has yet to rule upon the propriety of a percentage fee award."[253] In recent years, the trend has been toward the percentage of recovery method.[254] For example, the Court of Appeals for the Eleventh Circuit has required the percentage method in common fund class actions.[255] The Third,[256] Seventh,[257] and Ninth[258] Circuits authorize either the lodestar or the percentage method.

---

250. A basic premise of the percentage of recovery method is that a common fund is "itself the measure of success . . . [and] represents the benchmark from which a reasonable fee will be awarded." 3 Newberg & Conte, *supra* note 55, § 14.03, at 14-4. *See also* Camden I Condominium Ass'n v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991).

251. Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973). The Supreme Court never formally adopted the lodestar method in a common fund case. MCL 3d, *supra* note 34, § 24.121, at 189.

252. The latest swing away from lodestar received momentum from a footnote in a 1984 Supreme Court decision that distinguished between calculation of fees under fee-shifting statutes (where "a reasonable fee reflects the amount of attorney time reasonably expended") and the common fund doctrine ("where a reasonable fee is based on a percentage of the fund bestowed on the class"). Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984).

Additional momentum came in 1985 when a Third Circuit task force, formed to examine court-awarded attorneys' fees, recommended the percentage of recovery method for common fund cases. Court Awarded Attorneys' Fees, Report of the Third Circuit Task Force, *reprinted in* 108 F.R.D. 237, 255–56 (1985) [hereinafter Task Force Report]. The Task Force Report discussed criticism by courts, commentators, and members of the bar. Criticism included that lodestar has proven to be difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result. *Id.* at 246–53.

253. MCL 3d, *supra* note 34, § 24.121, at 188 (footnotes omitted).

254. *Id.* at 189.

255. *See* Camden I Condominium Ass'n v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991) ("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class.").

256. For example, in evaluating which method the district court could use, the Third Circuit stated recently that "the court may select the lodestar method in some non-statutory fee cases where it can calculate the relevant parameters (hours expended and hourly rate) more easily than it can determine a suitable percentage to award." *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 821 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995).

257. *See, e.g., In re* Continental Ill. Sec. Litig., 962 F.2d 566, 572 (7th Cir. 1992) (fee award simulating "what the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character" would be appropriate); Florin v. NationsBank of Georgia, 34 F.3d 560, 565 (7th Cir. 1994); Harmon v. Lymphomed, 945 F.2d 969, 975 (7th Cir. 1991). Although permitting either method, the Seventh Circuit has expressed a preference for the percentage method. *In re Continental Illinois*, 962 F.2d at 572–73.

258. Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990) (allowing use of either percentage or lodestar calculation method in common fund case). *See also In re* Washington Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1295 (9th Cir. 1994). In Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989), the Ninth Circuit held that the percentage method is particularly suited for cases with multiple claims where it would be difficult to identify what fees directly relate to the claims that created the fund.

*Class Actions*

Proponents of the percentage method believe that it encourages early settlements and provides benefits to efficient counsel who under a lodestar approach might be penalized, rather than rewarded, for their efficiency.[259] The percentage method also saves the court from the cumbersome task of closely scrutinizing lodestar fee petitions to determine whether the hours claimed were reasonably spent for the benefit of the class.[260]

At the same time, the percentage method has been criticized because, when strictly applied, it can result in windfalls to class counsel in cases with very large settlements. Conversely, class attorneys can be penalized if they take on challenging cases that yield small monetary recoveries.[261] The method has also been criticized because it encourages early settlement and, thus, might deny the class a potentially more generous recovery that further litigation could bring.[262]

In a relatively small number of study cases, the court awarded fees pursuant to fee-shifting statutes, such as the one governing civil rights claims,[263] rather than under the common fund doctrine. Although over the past decade the percentage method has gained favor in common fund cases, lodestar remains the accepted method in fee-shifting cases.[264] Given that the common fund doctrine applies in most class actions, we will concentrate our discussion on that doctrine.

*Data and Discussion.* For all certified and settled cases in the study, lodestar was used more frequently than the percentage method in only one district, E.D. Pa. (see Figure 71). Even in that district, however, the percentage method was used nearly as much as lodestar. By contrast, N.D. Cal. determined fees by percentage of recovery 6:1 over lodestar and N.D. Ill. nearly 2:1

259. "Objections to the lodestar method were based on the . . . premise that attorneys pad their hours and otherwise engage in unethical activities to enhance their fees, and that key decisions pertaining to settlement are affected by counsel fees." Downs, *supra* note 50, at 667. *See also* 3 Newberg & Conte, *supra* note 55, § 14.03, at 14:3 to 14:7 and cases in nn. 17–20; Kirchoff v. Flynn, 786 F.2d 320, 324 (7th Cir. 1986) (lodestar creates an incentive to run up hours in relation to the stakes of the case); *In re* Oracle Sec. Litig., 131 F.R.D. 688, 693–97 (N.D. Cal. 1990) (same). For additional problems identified with the lodestar method, see Monique Lapointe, Note, *Attorneys' Fees in Common Fund Actions,* 59 Fordham L. Rev. 843, 847-61 (1991).

260. *See* Skelton v. General Motors Corp., 860 F.2d 250, 253 (7th Cir. 1988), *cert. denied,* 493 U.S. 810 (1989).

261. Cooper, *supra* note 6, at 34.

262. Some critics maintain that settlement sometimes occurs when class counsel determines that the case has reached its point of diminishing returns from the fees perspective, with class counsel viewing the additional attorney time necessary to obtain a larger class recovery as not cost beneficial. *See generally* John C. Coffee, Jr., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation,* Law & Contemp. Probs., Summer 1985, at 5, 41–44 [hereinafter Coffee, *Unfaithful Champion*]. *See also* John C. Coffee, Jr., *The "New Learning" on Securities Litigation,* N.Y.L.J., Mar. 25, 1993, at 5 [hereinafter Coffee, *New Learning*]. For a discussion of conflicts of interest that these situations create between class counsel and the class, see generally MCL 3d, *supra* note 34, § 30.16.

263. *See, e.g.,* Civil Rights Act of 1964, 42 U.S.C. § 1988 (1988) (public accommodation and employment discrimination cases). Such statutes specifically authorize recovery of attorneys' fees by the prevailing party. Whether the award is mandatory or permissive depends on the terms of the particular statute and applicable case law. MCL 3d, *supra* note 34, § 24.11. The availability of statutory fees is driven by public policy, encouraging private enforcement of substantive rights under the law. Statutory fee cases often produce only nominal damages or declaratory judgments—the kind of results that usually cannot be quantified. *See generally* Lapointe, *supra* note 259, at 865–67 (discussion of the differences between statutory and common fund cases).

264. Blanchard v. Bergeron, 489 U.S. 87, 94 (1989) (indicating that lodestar approach is the centerpiece of attorneys' fee awards in a statutory fee case (citing Hensley v. Eckerhart, 461 U.S. 424 (1983))); Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986); Blum v. Stenson, 465 U.S. 886, 897 (1984). *See generally* Hirsch & Sheehey, *supra* note 249, at 19-44.

over lodestar. It appeared that the percentage method was the exclusive method in S.D. Fla. (see Figure 71).

Interestingly, S.D. Fla., which did not use lodestar, had the lowest average rate (24%) while E.D. Pa., which used lodestar the most, had the highest average fee-recovery rate (30%) (see Figure 68). The differences were not as pronounced for median fee-recovery rates, which ranged from 27% (S.D. Fla.) to 30% (N.D. Ill.) (see Figure 68).[265] Factors other than selection of fee-calculation method, of course, may have contributed to these results. Moreover, similar differences in mean and median fee-recovery rates were found when we looked only at cases using the percentage of recovery method (see Figure 72).

The four courts differed in their approaches to fee calculation depending on whether or not the settlement created a fund for distribution to the class. In certified cases with net monetary distributions to class members (distribution cases), the percentage method was far more prevalent than lodestar (see Figure 73). As one would expect, in settlements where the only benefits to the certified class were those that could not be easily quantified (no distribution cases), courts generally used lodestar or relied on consensual fee determinations (see Figure 74).

We will first discuss distribution cases. In the three districts where the appellate courts have authorized either fee-calculation method, lodestar was used in less than 10% of the distribution cases in two districts but in a third of the cases in E.D. Pa.[266] (see Figure 73). In all four districts, judges determined fees using the percentage method in 45% or more of the distribution cases. Percentage of recovery appeared to be the sole method used in S.D. Fla.[267] In N.D. Cal., judges used it in 78%[268] of the distribution cases, compared to about 60%[269] in N.D. Ill. and 45%[270] in E.D. Pa.[271] (see Figure 73).

In no distribution cases, lodestar was the dominant method in two districts (see Figure 74). In the other two districts, findings were less informative because, in all but a few cases, the parties consented on fees or the method used was not apparent from case files. In all four districts, nine cases were determined by lodestar and three by percentage of recovery (see Figure 74).[272] It appears that in many cases the court opted for lodestar when it could not quantify the value of class benefits, making a percentage of recovery calculation problematic.

---

265. Generally, the study could not measure the degree to which higher fee-recovery rates reflected high quality work done, efforts to pursue challenging but deserving claims, or other factors. See discussion of fee adjustments and multipliers *infra* § 16 (c).

266. The mean and median fee-recovery rates in E.D. Pa. distribution cases using lodestar were 30% and 28%, respectively, compared to 28% and 27% using the percentage method.

267. In S.D. Fla., all percentage method cases involved securities claims.

268. In N.D. Cal., over 80% of the percentage method cases involved securities issues. None involved civil rights claims.

269. In N.D. Ill., 60% were securities cases; 10% involved civil rights.

270. In E.D. Pa., nearly 90% were securities cases; no cases involved civil rights.

271. In one case each in two districts, the court applied both the lodestar and percentage of recovery methods (see Figure 73). These cases are included in the percentages cited above. In addition, we could not determine the method the court used in about 20% of the distribution cases where generally the parties stipulated to a fee award and the court approved all or most of the stipulated amount.

272. In 50% or more of the cases, parties stipulated to fees or the fee method was otherwise unknown.

*Class Actions*

Civil rights claims were generally more prevalent in no distribution cases.[273] In part, this explains the higher lodestar usage in no distribution cases; lodestar is the appropriate method when the court applies a fee-shifting statute.[274]

*The Percentage Method.* Median fee-recovery rates for distribution cases ranged from 27% to 30% when the percentage method was used, consistent with precedents in the four districts' respective courts of appeals (see Figure 72). For example, recently the Third Circuit cited an E.D. Pa. decision that noted that fee awards have ranged from 19% to 45% of the common fund.[275] In recent decisions, the Seventh[276] and Eleventh[277] Circuits have discussed benchmarks or ranges of 20% to 30%. In addition, the Eleventh Circuit has instructed district courts to apply the twelve *Johnson* factors[278] and other pertinent factors[279] in determining the fee percentage. The Ninth Circuit has indicated that 25% should be the "benchmark"[280] for such awards, subject to adjustment upward or downward to account for any unusual circumstances involved in a case.[281] When federal district courts across the country use the percentage of recovery method for common fund cases, most select a percentage in a range from 25% to 30% of the fund.[282]

*Other Methods.* To prevent a windfall to plaintiffs' counsel in cases where the settlement fund is unusually large, some courts have used the lodestar method[283] or a sliding scale percentage

273. Civil rights cases represented 44%, 0%, 19%, and 40% of cases with no net monetary distribution to the class, compared to 6%, 11%, 11%, and 9% of cases where the class received net monetary distributions.

274. *See supra* note 264.

275. *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 822 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995) (citing *In re* SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 533 (E.D. Pa. 1990)).

276. *See* Florin v. NationsBank of Georgia, 60 F.3d 1245, 1248 (7th Cir. 1995) (quoting *In re* Unisys Corp. Retiree Medical Benefits ERISA Litig., MDL No. 969, 1995 WL 130679, at *12 (E.D. Pa. Mar. 22, 1995) ("'the benchmark in common fund cases is 20%–30%'").

277. Camden I Condominium Ass'n, Inc. v. Dunkle, 946 F.2d 768, 774–75 (11th Cir. 1991) (noting that percentage method is "better reasoned" for common fund cases and that the "majority of common fund fee awards fall between 20% and 30% of the fund"). In addition, the Eleventh Circuit stated, as a general rule, that 50% may be established as an upper limit. *Id.*

278. Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974).

279. The other factors include "the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by settlement, and the economics involved in prosecuting a class action." *Camden I*, 946 F.2d at 775. *See* discussion of fee enhancements *infra* § 16(c).

280. "A benchmark is a single percentage figure used over and over again, regardless of the type of litigation or the size of the recovery." Lapointe, *supra* note 259, at 867, n.165.

281. *See* Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990) (25% of $850,000 in damages; a percentage award "should be adjusted or replaced . . . when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors"). *See also* Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989) (25% of a $4,736,000 recovery); *In re* Pacific Enterprises Sec. Litig., 47 F.3d 373, 379 (9th Cir. 1995) (an award of 33% was justified because of the complexity of the issues and the risks). See discussion of fee enhancements *infra* § 16 (c).

282. MCL 3d, *supra* note 34, § 24.121, at 189 (25%–30% range). *See also* Hirsch & Sheehey, *supra* note 249, at 68 (20%–30% range).

283. *In re* Washington Public Power Supply Sys. Litig., 19 F.3d 1291, 1297 (9th Cir. 1994) ("the 25% 'benchmark' is of little assistance" in a case where the settlement fund was large ($687 million)).

method with the percentage to be awarded decreasing as the size of the fund increases (sliding scale percentage method).[284] Only one case in the study had a gross monetary settlement amount greater than $50 million.[285] The fee-recovery rate in that N.D. Cal. case was 19%, below the Ninth Circuit benchmark of 25%.[286]

In another case, as part of a bidding process for lead class counsel, the court selected a fee structure that included the sliding scale percentage method. In addition, the fee percentage under this structure would be discounted by 20% if the case settled within the first year of litigation (an early settlement discount). That is, in addition to the sliding scale based on settlement amount, the class would also receive a discount on fees if the case settled early.[287] Such discounts generally are intended to keep class counsel from settling prematurely, under the theory that early settlement is likely to be advantageous to class counsel but detrimental to the class.[288] Some ascribe to this theory in particular with respect to cases with large potential recoveries where, as described above,[289] the sliding scale percentage method would decrease the fee percentage as the size of the fund increases. To offset any incentives for attorneys to settle early and obtain fees at a higher percentage of a smaller settlement, the early settlement discount has been introduced as a disincentive to premature settlement.

### (c) How was benefit to the class taken into account?

*Overview.* In determining fee awards, the courts often included consideration of the extent to which the class benefited from the settlement. We looked for the following as indicators: (1) use of the percentage of recovery method, (2) any adjustments to the lodestar amount based on results achieved, and (3) whether the court considered any fee objections.

Using this somewhat limited data-gathering technique, it was apparent that the court took class benefits into account in at least 80% of the distribution cases in two districts and at least 68% and 51% of the time in the other two districts (see Figure 73).[290] In the balance of the dis-

---

284. *See* Task Force Report, *supra* note 252, at 256. *See also* Florin v. NationsBank of Georgia, 60 F.3d 1245 (7th Cir. 1995) ("fee awards usually fall in the 13 percent–20 percent range for funds of $51–$75 million, and in the 6 percent–10 percent range for funds of $75–$200 million"). *See also* Coffee, *New Learning, supra* note 262, at 7 n.13 and accompanying text. But, it has been noted:

> A percentage is a relative concept and one court's award of twenty-five percent of a $19.3 million recovery does not mean that the percentage continues to be reasonable when applied to a $4.7 million recovery. Thus, the notion that a percentage falling within a certain range is reasonable is inherently misleading.

Lapointe, *supra* note 259, at 868 & n.170.

285. Stender v. Lucky Stores, Case No. 88-1467 (N.D. Cal. filed April 22, 1988).

286. The parties stipulated to attorneys' fees and the court awarded the full amount of the fee request.

287. *In re* Oracle Sec. Litig., 132 F.R.D. 538, 541 (N.D. Cal. 1990). The selected fee structure was as follows:

| Recovery (in millions) | Time for Resolution | |
|---|---|---|
| | 0–12 months | 13 or more months |
| Up to $1 | 24% | 30% |
| $1–$5 | 20% | 25% |
| $5–$15 | 16% | 20% |
| $15 or more | 12% | 15% |

288. *See supra* note 262 and accompanying text.

289. *See supra* note 283.

290. This is in contrast to Professor Downs' findings that "class attorneys received substantial awards . . . with

tribution cases, case files did not provide sufficient information on fee-award rationale, often because awards were based on consent of the parties or unadjusted lodestar calculations. Given this, we generally could not determine whether or not the courts considered class benefits in their fee decisions for these cases. To the extent that they did, the percentages cited above are understated.

   *Background on fee adjustments and multipliers.* One method courts have used to take class benefits and other considerations into account has been to apply enhancements or reductions to fee awards.[291] In common fund cases, the trend had been that fee enhancements, where not otherwise prohibited, should be reserved for the rare case in which the standard fee-calculation method will not adequately compensate the professional.

   One method used to enhance fees has been to apply a multiplier to the lodestar amount.[292] In the past, the Seventh Circuit suggested limiting multipliers to a 200% increase in the lodestar.[293] The majority of courts, however, had not imposed such limits.[294]

   *Data and discussion on fee adjustments and multipliers.* In two cases, the lodestar was enhanced by a multiplier. In each case, the multiplier was approximately 2.5 times the lodestar amount, resulting in a $765,000 (34%) fee award on a $2.2 million gross settlement in one case

---

little or no judicial scrutiny." Downs, *supra* note 50, app. at 710–11 (Chart D).

   291. When counsel request fee enhancements, arguments generally are that the case was especially difficult, that the ultimate results produced exceptional benefits for the class, or that performance was otherwise superior. Counsel also sometimes asks for adjustments to reflect the novelty of the issues presented, risk of nonpayment, and delay in payment (loss of use of money). *See* Hirsch & Sheehey, *supra* note 249, at 69–70; 3 Newberg & Conte, *supra* note 55, § 14.03. *See also* Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974) (twelve factors to be used in determining attorneys' fees); Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975), *cert. denied*, 425 U.S. 951 (1976); Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 562-66 (1986) (Delaware Valley I) (in the context of fee-shifting statutes, *Johnson* factors are subsumed within the lodestar amount absent extraordinary circumstances).

   292. In a decision that might have affected the use of multipliers in study cases, on June 24, 1992, the Supreme Court barred risk multipliers (fee enhancers that account for counsel's risk of nonpayment) in statutory fee-shifting cases. City of Burlington v. Dague, 505 U.S. 557 (1992). The decision, however, did not address specifically whether risk multipliers remain available in common fund cases. The effect of *Dague* on study cases (i.e., cases terminated in the four districts between July 1, 1992, and June 30, 1994) is unclear; the relevant appellate courts did not begin to interpret the decision in the class action context until March 1994.

   The Seventh and Ninth Circuits concluded that *Dague* does not extend to common fund cases. *See* Florin v. NationsBank of Georgia, 34 F.3d 560, 564-65 (7th Cir. 1994) (op. dated Sept. 8, 1994); *In re* Washington Public Power Supply System Sec. Litig., 19 F.3d 1291, 1300 (9th Cir. 1994) (holding that district court erred by refusing to award risk multiplier to lodestar calculation) (op. dated Mar. 23, 1994). On the other hand, a recent Third Circuit opinion, interrupting *Dague*, could be read to prohibit the use of multipliers for lodestar enhancement in common fund class actions. *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 822 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995).

   293. Skelton v. General Motors Corp., 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989). *But see In re* Superior Beverage/Glass Container Consol. Pretrial, 133 F.R.D. 119, 132 (N.D. Ill. 1990) (awarding multipliers ranging from 1.5 to 2.5, depending on each attorney's contribution). *See also In re* Continental Ill. Sec. Litig., 750 F. Supp. 868, 896 (N.D. Ill. 1990) (no multiplier allowed), *rev'd*, 962 F.2d 566, 569 (7th Cir. 1992). These three cases were not in the study.

   294. *See* Richard B. Schmitt, *Shareholders Suits Pay Attorneys Less*, Wall St. J., Feb. 1, 1991, at B1, col. 4.

*Findings*                                                                                  75

and a $9.5 million fee award in the *General Motors Pick-Up Truck* settlement recently vacated on appeal.[295]

The dearth of enhancers or other adjustments in study cases might be related to the frequent use of the percentage method where the selected percentage itself can incorporate the factors that previously resulted in fee adjustments. Similarly, there is a trend, and in fee-shifting cases a mandate, to incorporate those factors into the lodestar components. Also, it is possible that, prior to 1994 appellate decisions affecting two of the study courts, *Dague* had a chilling effect on enhancements in common fund cases.[296]

**(d) What percentage of the fee amounts requested were awarded and how often were objections and appeals filed concerning fees?**

*Data and Discussion.* We looked at how frequently the court awarded fee amounts less than counsel requested. Again, we found differences depending on the calculation method used. In the three districts that used the lodestar, courts granted lodestar amounts less than requested in 22%, 17%, and 33% of the cases. By contrast, when these same three courts used the percentage method, they reduced fee requests in 43%, 9%, and 16% of certified case settlements, respectively. The fourth district did not use lodestar and apparently did not reduce percentage method requests. Regardless of the method, the vast majority of awards were 90% to 100% of the request.

Class members, or other interested parties, did not object to fees very often; objections were filed with respect to five out of thirty-four (15%) fee awards in one court, three of eleven (27%) in another, five of thirty-four (15%) in the third, and seven of twenty-eight (25%) in the fourth district. An objection was filed in only one lodestar case (representing 11% of lodestar cases in that district and 6% of lodestar cases in the four districts combined). In contrast, rates of fee objection were higher in cases using the percentage method[297] (see Figure 75). Since objections were filed in percentage method cases 4.5 times as often as under lodestar, these results could be read to indicate that objections are more likely under the percentage method. However, one must also consider that notices of proposed settlement identified fee-related amounts[298] in 33% of the lodestar cases compared to 78% of percentage method cases. That is, for all four districts combined, class members in percentage cases were given information about fee amounts 2.4 times as often as in lodestar cases. Even considering this, however, there appeared to be less propensity to object under lodestar for some reason. Note, however, that one cannot extrapolate these data on a small number of cases to all class actions nationwide; factors other than those discussed here may have caused these results.

Appeals were filed in 15% to 34% of study cases (*see infra* § 20). For three of the four districts, 3% to 7% of these appeals (four or fewer per district) involved attorneys' fees issues,[299]

---

295. *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 822 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995).

296. *See supra* note 292.

297. The rate reflects the number of percentage method cases with at least one fee objection divided by the number of percentage method cases.

298. These notices described the proposed settlements and either stated the amount or range of fees or the percentage of the settlement fund to be allocated to fees, subject to court approval.

299. Not including appeals on sanctions.

*Class Actions*

often accompanying appeals on other issues. In the fourth district, three fee-related appeals constituted 25% of the court's class action appeals. All fee-related appeals were challenges to the award, denial, or reduction of plaintiffs' counsel fees. In total, for the four districts, there were ten such appeals. One of these cases, the *General Motors Pick-Up Truck Litigation*, resulted in vacating a "settlement class" settlement that included $9.6 million in fee awards. The other appeals ended in fee-award affirmance (two cases), appeal dismissal (two cases), reversal of denial of fees (one case), vacating the trial court's reduction of fees (one case), and remanding for reconsideration (one case). The two other appeals were pending (see Tables 51 to 54).

## (17) Trivial Remedies; Other Remedies

### (a) How frequently did certified (b)(3) classes lead to relief that is relatively trivial in comparison to attorneys' fees?

Study results did not show recurring situations where (b)(3) actions produced nominal class benefits in relation to attorneys' fees. (*See also supra* § 1(a) for a discussion of the average recovery per individual class member and of cases in which the average individual recovery was less than $100.) We gauged this by determining, for each certified case with (b)(3) recovery, what percentage of the gross monetary settlement was paid to class counsel. This fee-recovery rate exceeded 40% in 11% of settled cases in two districts and in less than 5% of settled cases in the other two courts (see Figure 67).[300] In half of these cases, case files provided information that helped explain the "high" rates. For example, in some cases, monetary relief was accompanied by nonquantifiable (b)(2) benefits, such as a permanent injunction for the benefit of the class. In other cases, the settlement produced relatively small payments to the class as well as to attorneys for the class.[301] (For a more detailed discussion of fee-recovery rates, *see supra* § 16(a).)

In the four districts, in twelve cases that were certified *solely* under Rule 23(b)(3), attorneys' fees were awarded but no objectively quantifiable monetary relief was awarded to the class. Table 46 summarizes the relief and the attorneys' fee awards in those cases. Assessing whether the relief is trivial in relation to the fees calls for subjective judgments that we leave to the readers. The fee awards in these cases were generally the product of a stipulation (eight of nine cases for which information was available). In one case, the *General Motors Pick-up Truck Litigation*, the

---

300. The "fee-recovery rate" exceeded 40% in the following numbers of cases: two of eighteen certified settled cases with net monetary distribution in each of two districts, one of twenty-three cases in the third district, and zero of nine cases in the fourth.

301. In the case with the highest fee-recovery rate (71%), a $34,000 monetary class recovery and $83,000 fee award were accompanied by a prothonotary's agreement to place future interpleaded funds in separate interest-bearing accounts. The second highest rate (63%) involved a $3.6 million fee award, $300,000 in notice costs and a $1.8 million net cash distribution to a certified class of approximately 2,000 stockholders that incurred stock losses. The third highest rate (around 47%) was related to a $82,000 net monetary distribution to a class of terminated members of a health plan, with attorneys' fees of $76,000. The fourth largest rate (45%) was based on a $21,000 net monetary distribution and $17,500 in fees related to bank customers that received *improper* forms. Two other cases had high rates (just over 40% in each). One was a securities case, where the court used the percentage of recovery method but did not place a value on other nonclass benefits valued by class and settlement counsel at $8.3 million. The other was a lodestar case with a net monetary settlement of $200,000 where no noneconomic benefits were apparent in the case file. There also may have been other factors, not apparent in case files, that affected the rates at which fees were awarded.